[Cite as *Gilham v. Stasiulewicz*, 2010-Ohio-6407.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

JERRY JO GILHAM                    )        CASE NO. 09 JE 25
                                   )
    PLAINTIFF-APPELLANT         )
                                   )
VS.                                )        OPINION
                                   )
ALBERT STASIULEWICZ                )
                                   )
    DEFENDANT-APPELLEE          )

CHARACTER OF PROCEEDINGS:          Civil Appeal from the Court of Common
                                   Pleas of Jefferson County, Ohio
                                   Case No. 08 CV 44

JUDGMENT:                          Affirmed in Part.  Reversed and
                                   Remanded in Part.

APPEARANCES:

For Plaintiff-Appellant:           Atty. Gary M. Stern
                                   108 South Fourth Street
                                   Steubenville, Ohio  43952

For Defendant-Appellee:            Atty. Steven A. Stickles
                                   500 Market Street, Suite #10
                                   Steubenville, Ohio  43952

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                                   Dated:  December 23, 2010

WAITE, J.

{¶1}  Appellant, Jerry Jo Gilham appeals the judgment of the Jefferson

County Court of Common Pleas against her and in favor of Appellee, Albert

Stasiulewicz, following a bench trial in this breach of contract and Consumer Sales Practices Act ("CSPA") action. Appellee replaced pipes leading to Appellant's in-ground swimming pool and twice replaced a portion of the cement surrounding the pool. Due to problems with the initial cement pour, the cement was torn up and poured a second time at Appellee's expense. After the second pour, the pool liner was replaced by another contractor. When the pool was filled, water collected behind the liner and the pump did not function properly. Ultimately, five return lines were replaced by yet another contractor.

{¶2} At trial, Appellant argued that the pipes installed by Appellee did not hold pressure because Appellee used substandard fittings and the wrong adhesive, he failed to rest the new lines on virgin soil, and he did not replace the clay surrounding the new pipes and pool walls with gravel. Appellee argued that Appellant failed to establish that the fittings and glue were substandard or that his placement of the pipes and use of the original backfill constituted substandard work. He attributed the problem to a cracked piece of plastic that he claimed was broken during the installation of the pool liner by the second contractor.

{¶3} The trial court concluded that Appellant had failed to establish by a preponderance of the evidence that Appellee had performed substandard work or had violated the CSPA. In this appeal, Appellant argues that the trial court's decision on her breach of contract claim was against the manifest weight of the evidence in her first assignment of error and contrary to law in her second assignment of error. In her third assignment of error, she contends that the trial court's decision on her CSPA claim was against the manifest weight of the evidence.

**{¶4}** Because there is some competent, credible evidence supporting the trial court's decision that Appellee did not beach his contract, Appellant's first and second assignments of error are overruled. Her third assignment of error, to the extent that it is predicated on Appellee's failure to correct substandard work, is likewise overruled. However, Appellant's third assignment of error, as it relates to Appellee's failure to comply with various administrative provisions of the CSPA, has merit and is sustained.

Facts

**{¶5}** The trial court heard the testimony of Appellant; Appellee; Douglas Rawson, the President of Dream Design Builders, who replaced return lines after Appellee; John Oliver, the owner of Oliver's Pools and Spas, who twice pressure tested the lines installed by Appellee; and Thomas Clark and Ryan Davis, two of Appellee's employees who assisted him in the work he performed for Appellant.

**{¶6}** Appellee is a general contractor licensed by the City of Steubenville. (Trial Tr., p. 139.) While not initially contacted for repair to the pool lines, Appellee told Appellant that he worked on his own pool and had done repairs on other pools. (Trial Tr., p. 20.) Appellee testified that he built his own pool twenty years ago, and that he currently "take[s] care" of two other pools. (Trial Tr., p. 164.) Oliver has been in the pool business for over thirty years, and said that the majority of his business is repair, but he has also been engaged in some new pool construction. (Trial Tr., pp. 81-82.) Rawson has been with Dream Designs since 2001, but has been working on pools since 1992. (Trial Tr., p. 103.)

{¶7}   On June 9, 2007, Appellant contracted with Appellee to replace a portion of the original concrete surrounding her pool.   The parties agreed to a contract price of $4,600.00 (Trial Tr., pp. 16, 142.)

{¶8}   Appellee testified that he provided a receipt for the work on that day. The receipt, which is partially illegible, reads, "[t]ake out old cement Put in 9 yr 6 mag with fiber Put [ ] next to house Steel mesh in cement [ ] rods at cuts Customer will pay extra for cuping & skimer [sic]."  (Plaintiff's Exh. 1.)   The receipt is not dated, but Appellant concedes that she received it on June 9, 2008.   (Trial Tr., p. 18.)   The receipt reflects that the cost of the project was $4,600.00, and Appellant made a $3,600.00 down payment, with $1,000.00 balance due.   Appellee told Appellant that he had insurance coverage, however, he later discovered that there was no policy in effect when he performed the work at Appellant's residence.   (Trial Tr., p. 19.)

{¶9}   While the concrete was being torn out, Appellant attempted to contract with Oliver to replace a number of leaking underground pipes.   Appellant testified that she did not plan to fix the leaking lines at first, because the pool still functioned.   (Trial Tr., p. 70.)   She changed her mind about replacing the lines at some point prior to or during the removal of the concrete.   (Trial Tr., p. 70.)   However, after the concrete was torn out, and Oliver had not returned Appellant's calls, Appellant then entered into an oral contract with Appellee to replace the pipes.   (Trial Tr., pp. 20, 146-147.)

{¶10} At trial, Appellant did not specifically identify the pipes that she contracted with Appellee to replace, nor did she identify the number of pipes that he was contracted to replace.   In fact, there is no testimony to clearly establish how many lines the pool had in total.   Throughout the trial, witnesses referred generally to

"the lines" or "the pipes." During Appellant's redirect testimony, a document she prepared, captioned "Chronology of Events regarding Pool and Cement Repairs Summer 2007" ("chronology of events"), was admitted into evidence without objection. The document reads, in pertinent part, "[Appellee] agree[d] to replace the five lines running from the pool to the pump/motor." (Plaintiff's Exh. 27, p. 1.) According to Oliver, the pool pump is a "[t]hree-quarter or 1 [horsepower] with five lines." (Trial Tr., p. 88.) Thus, the pool may have operated on five lines total, but the record is silent as to which, or how many, Appellee was to replace.

{¶11} No receipt was provided for the additional work. (Trial Tr., p. 21.) Appellant testified that Appellee told her the additional work would cost $1,250.00, but when the work was completed she was charged $1,465.00. (Trial Tr., p. 20.) Appellee testified that he provided Appellant an estimate of the cost of pipe replacement because, prior to digging up the pipes, he did not know how many of them needed to be replaced or how deep they were buried. (Tr., p. 147.)

{¶12} Appellee testified that the fittings from the original pool installation were not pressure fittings. (Trial Tr., p. 148.) He conceded that he then replaced the original fittings with non-pressure fittings. According to Appellant's testimony, Oliver was at her house at some point prior to the first cement pour, and he told her that Appellee was using the wrong fittings. (Trial Tr., p. 25.) Appellant relayed to Appellee that Oliver recommended the use of pressure fittings instead of non-pressure fittings. Appellee assured Appellant that "he, you know, knew what he was doing and it would be fine." (Trial Tr., p. 25.)

{¶13} According to Appellee's testimony, the first pour commenced without any suggestion that he used the wrong fittings. In fact, Appellee testified that the lines were pressure tested prior to the first pour. (Trial Tr., p. 148.) Appellee claimed that Oliver performed a pressure test and one of the lines leaked. (Trial Tr., p. 151.) Appellee testified that the defective line was by the skimmer and he replaced it with a pressure fitting. When asked if it was pressure tested after the line was fixed, Appellee responded, "I suppose. I was given the okay that everything was all right." (Trial Tr., p. 152.)

{¶14} Appellee conceded that one-third of the way through the pour, he realized that he was "losing the cement." (Trial Tr., p. 152.) Two days later, on July 8, 2007, Appellee returned to Appellant's house and offered to refund $1,500.00 or to tear up the defective cement. (Trial Tr., p. 153.) Appellant chose to have him replace the cement. The receipt for this work, which is handwritten on a piece of note pad paper reads, "[t]ear up cement Replace with new cement Fix side yard." (Plaintiff's Exh. 4.) It is signed by Appellee.

{¶15} While tearing out the cement for the second time, Appellee damaged Appellant's skimmer, but he repaired the damage. (Trial Tr., pp. 154-155.) According to Appellee, it was at this point that he was first approached by Appellant about installing the wrong fittings. (Trial Tr., p. 155.) Appellee told Appellant not to worry, and that everything would be fine. Appellee testified that he told Appellant that they would "tear it all up and * * * replace it all, all the pipes." (Trial Tr., p. 156.)

{¶16} Appellee testified that he replaced all of the below-ground fittings with pressure fittings and that he covered the pipes with gravel and loose dirt. (Trial Tr.,

pp. 158-159, 162.) Clark also testified that Appellee replaced all of the fittings with high pressure fittings. (Trial Tr., p. 131.) According to Appellee, after a pressure test, he was authorized to re-pour the cement. He could not recall whether Appellant or Oliver told him that the lines held the pressure. (Trial Tr., p. 187.)

{¶17} According to Appellant, after the cement was torn out the second time, Appellant paid Oliver $235.40 to pressure test the lines, and two of the lines did not hold pressure. (Trial Tr., pp. 26-27, 60.) Oliver testified:

{¶18} "I went to check the fittings and they were leaking. I pressure tested them and I had seen that one fitting before I even pressure tested it settled out of the skimmer when they buried it. This is before any cement or anything was done and it, in fact, was a DWV fitting and it let go. So, I recommended to him then to replace it with a pressure fitting. That was the only conversation I had with him." (Trial Tr., p. 85.) Appellant testified that, after Appellee spoke with Oliver he promised that he would "make it right." (Trial Tr., p. 28.)

{¶19} Appellant testified that Oliver performed a second test after Appellee allegedly changed all of the fittings, and that the lines held 6-7 pounds of pressure overnight. (Trial Tr., pp. 29, 87.) However, at trial, Oliver explained that "[t]he plumbing hadn't been finished all the way out though. This was about ten feet from where they would terminate into the filter of where [he] had checked." (Trial Tr., p. 87.)

{¶20} Appellee re-poured the cement on August 3, 2008, and Oliver replaced the pool liner on August 10, 2008. (Trial Tr., pp. 30-31.) Appellant filled the pool for the first time on August 20, 2008, but water collected behind the pool liner and the

pump was not functioning properly. (Trial Tr., p. 32.) Appellant testified that Oliver told her that water was leaking from the lines. Rawson testified that, based on the pressure test performed after the cement was poured the second time, he assumed that the pipes were leaking. (Trial Tr., p. 96.) Appellant called Appellee, but Appellee claimed that Oliver must have loosened the fittings when he installed the liner. (Trial Tr., p. 33.)

{¶21} Appellant offered no testimony as to which specific lines installed by Appellee were leaking following Appellee's last repair. The only testimony offered at trial that referred to Appellee's repairs was Appellant's statement that, "we had to take out all of the lines that [Appellee] installed and some of the fittings had been changed and some had not." (Tr., p. 37.) Appellant also submitted two documents that were admitted into evidence, both of which were drafted by her. According to a certified letter sent by Appellant to Appellee and admitted into evidence without objection, four lines that Appellee replaced were leaking. (Plaintiff's Exh. 7.) Likewise, the chronology of events reads, in pertinent part, "[o]n August 16th, John Oliver tests the rest of the lines and determines that 4 of the 5 lines that had been replaced are leaking." (Plaintiff's Exh. 27, p. 2.)

{¶22} Instead of offering direct testimony to establish that one or more of Appellee's repairs were defective and how this was determined, Appellant appears to have simply assumed this fact. For instance, Appellant's counsel made five references to four leaking lines during his cross-examination of Appellee. (Trial Tr., pp. 179-181.) At oral argument, Appellant's counsel asserted that two lines were leaking.

{¶23} The testimony about the later repair by Rawson does not clarify the issue. Rawson testified that he replaced "return lines." (Trial Tr., p. 94.) A photograph taken by Rawson and admitted without objection at trial shows that five lines were installed by Rawson. (Plaintiff's Exh. 23, Trial Tr., p. 98.) Rawson testified that he replaced one line that was located under the original cement. (Trial Tr., p. 111.) However, he never testified that the lines he repaired had to be replaced because they were leaking.

{¶24} Furthermore, a proposal, dated September 11, 2007, and signed by Rawson and Appellant, reads, in pertinent part, "Dream Design will replace all lines and fittings that are leaking *or are not proper pressure fittings*/also we will tear out and replace all concrete up to 4 yards to uncover lines * * *." (Emphasis added). (Plaintiff's Exh. 8, p. 1.) Similar to Appellant's oblique testimony that all of the lines installed by Appellee had to be "take[n] out," the proposal also fails to establish that any of the lines that were installed by Appellee directly caused Appellant's continued problem.

{¶25} Adding to the confusion, Rawson, who was the only contractor who saw the pool lines after they were unearthed, conceded on cross examination that he could not identify the individual that installed the pipes that he replaced, and he could not even testify as to the age of the pipes that he replaced. (Trial Tr., p. 105.)

{¶26} Assuming arguendo that Appellant had directly established that one or more of the lines Appellee installed were leaking, conflicting testimony was offered regarding the actual cause. Appellant relied on the testimony of Oliver and Rawson for the proposition that Appellee installed the pipes in an unworkmanlike manner. At

trial, Rawson was asked if he discovered anything "unusual" when he dug up the cement. Rawson responded:

**{¶27}** "Number one, they had clay backfill against the pool. You should use gravel number 1 for the lay on the lines so that when it -- you pack it down as you go it doesn't settle. Number two, the lines were not put on virgin soil and you always come out, take an elbow straight down to the virgin soil so that it cannot compact and that way the line cannot shift and break and then you backfill with the gravel and you always use high pressure fittings, and they, whoever, I don't know who, didn't do that properly." (Trial Tr., pp. 97-98.)

**{¶28}** Once again, assuming facts not actually in evidence and referring generally to "the pipes," Appellant's counsel asked Rawson for "the reason that the pipes failed or leaked or didn't hold pressure and had to be redone." (Trial Tr., pp. 101-102.) Rawson blamed the combination of improper fittings and adhesive, the failure to replace the heavy dirt and clay with gravel, and the failure to seat the line on virgin soil.

**{¶29}** Appellant argued that Appellee used the wrong fittings and glue during the installation of the lines. Oliver testified that some pool companies use non-pressure fittings, also called DWV fittings, when installing and repairing pool lines, but that he used high pressure fittings. (Trial Tr., pp. 82, 86.) Oliver conceded that he did not know the industry standard for fittings, but he testified that a contractor is "better off" using a thicker fitting. (Trial Tr., p. 90.)

**{¶30}** Rawson testified that the industry standard was Lasco high pressure fittings, "because you have the inch-and-a-quarter so that the pressure of the pump

doesn't pull it apart and the pressure of the earth above doesn't pull it apart." (Trial Tr., p. 97.) Rawson testified that he did not know any contractors who did not use pressure fittings.

{¶31} Although Rawson could not state the exact number of non-pressure fittings that he found, he testified that there were "several" underground and "a couple" above ground. (Trial Tr., p. 100.) Three fittings taken out of the ground from the dirt surrounding the pool were offered as exhibits by Appellant. (Plaintiff's Exh. 26.) All of the witnesses conceded that only one of the fittings was a pressure fitting. Appellant testified that the fittings were attached to the pipe that Appellee replaced based upon the purple primer on the pipes. (Tr., p. 42.) (Tr., p. 57.) However, Appellee responded that when he replaced the non-pressure fittings he originally installed, he left them in as part of the fill, so the DWV fittings produced as Exhibit 26 must have been the fittings from his original installation. (Trial Tr., p. 177.)

{¶32} With respect to the adhesive, Appellee could not remember the color of the glue that he used, only that he purchased it from Oliver's and it was not orange. (Trial Tr., pp. 178-179.) Rawson testified that blue glue should have been used. (Trial Tr., p. 106.) Rawson testified that, although "some people" use yellow glue, it is substandard. (Trial Tr., p. 98.) The only color visible on Appellee's lines was purple, which the witnesses conceded was primer. (Trial Tr., pp. 99, 176.) Rawson testified that purple primer is typically used with yellow glue. (Trial Tr., p. 99.)

{¶33} The record reflects that conflicting testimony was offered regarding the propriety of the fittings and glue used by Appellee. In addition, Rawson conceded on

cross examination that he could not point to any fitting admitted into evidence at trial and state that it was a fitting that had leaked. (Trial Tr., p. 105.)

**{¶34}** Appellant also argued that Appellee's work was substandard because he did not rest his lines on virgin soil. Rawson testified that he installed his lines four feet into the ground, and that resting the pipes on virgin soil is an industry standard. (Trial Tr., pp. 102, 116.) Appellee conceded that, although he installed the first set of lines approximately 3½ to 4 feet deep, the second set of lines he installed was one foot deep. (Trial Tr., p. 167.) Clark confirmed that Appellee and his crew dug up the cement manually the second time and "when [they] reran the pipes [they] kind of raised them so [they] didn't have to dig down as deep as when [they] did with the backhoe so [they] didn't have to bring that back in * * *." (Trial Tr., p. 125.) He also testified that the "hard-packed clay [they] ran into was actually closer to the pool." (Trial Tr., p. 129.)

**{¶35}** However, Appellee testified that Rawson's lines were also not seated on virgin soil based upon the photographs offered at trial. Appellee stated, '[w]ell, [my lines] wasn't [sic] on the ground, just like this fellow's, doesn't appear his things are laying on the ground neither, except for this one section over here which, I mean, I don't know where that's at." (Trial Tr., p. 167.)

**{¶36}** Finally, Appellant argued that Appellee's work was substandard because he used the original clay fill rather than gravel to backfill the pool. (Trial Tr., pp. 101-102.) Appellee testified that there was no reason to remove the original fill and questions why Rawson would have removed it, since "it's been there for ten years. Why would you even bother touching that." (Trial Tr., p. 167.)

**{¶37}** Once again, the record reflects that conflicting testimony was offered regarding the propriety of the depth of Appellee's lines and the use of the clay fill. In addition, Rawson conceded on cross examination that no damaged pipe was offered as evidence in this case. (Trial Tr., p. 105.)

**{¶38}** When Rawson was asked on cross examination what he did with the "leaky pieces [of pipe]," Rawson responded, "[t]he -- this -- this was a part of it but if you look at Exhibit 22 you can definitely see that the clay pushed that down and cracked it off the return receptacle off the pool." (Trial Tr., p. 107.) In so doing, Rawson relied on a photograph marked Plaintiff's Exhibit 22. However, the damage to the line is not clearly depicted in that exhibit. The trial court could not see any pipe damage in the photograph and asked Rawson to specifically point out the alleged crack in the pipe.

**{¶39}** Rawson's testimony with respect to Plaintiff's Exhibit 22 was the only testimony he provided regarding any specific physical evidence of damage to the pipes. Rawson conceded that he could not identify the exact location of the line depicted in Plaintiff's Exhibit 22. (Trial Tr., p. 107.) However, he stated that the line was one that he replaced, and that it was "one of the returns." (Trial Tr., p. 108.) Rawson relied on a chalkboard illustration drawn by Appellee's trial counsel during his testimony, however the illustration was not made a part of the record.

**{¶40}** The only photographs admitted into evidence that depict visible damage to a pool line are Exhibits 15 and 17. Exhibit 17 is a photograph of a threaded plastic collar attached to a coupling that connects a return line to the pool. The threaded plastic collar is broken. The damage to the collar is vividly displayed in Exhibit 17 as

well as Exhibit 15. Appellant testified that the photographs depict the same collar. (Trial Tr., p. 44.) Neither Oliver nor Rawson provided any testimony regarding Exhibit 17. On cross examination, Appellant conceded that the threaded plastic collar was not an exhibit in her case. (Trial Tr., p. 71.)

{¶41} Appellee testified that the threaded plastic collar was a part of the joint that hooks on to the outside wall of the pool and connects the return line. (Trial Tr., p. 160.) Appellee further testified that the broken collar was something that was manipulated during the later installation of the liner. He stated, "[j]ust like this here, that white piece of thing that has to be screwed in and that's what goes against this * * * coupling and that's where your bolts go on and then that's what secures the liner around the hole and then you get a knife and you -- and you cut the liner out and that's where your suction or return's coming out." (Trial Tr., pp. 160-161.)

{¶42} Oliver testified that he did not "do anything with the pipes when [he] put the liner in." (Trial Tr., p. 91.) On cross examination, Oliver testified that, in thirty-five years, he had never seen the installation of a pool liner cause pool lines to leak, but that he could not definitively state that it could never happen. (Trial Tr., pp. 92-93.) Rawson testified that the installation of the pool liner could not have compromised the lines, because the liner installation only involved removing the face of the return and screwing it back on. (Trial Tr., p. 101.)

{¶43} Based on the foregoing testimony, the trial court concluded that no breach of contract was proved because "plaintiff has not established by a preponderance of the evidence that the work by the defendant was done in an unworkmanlike manner nor has the plaintiff established that the material used by and

installed by the defendant was done so in an unworkmanlike manner or was defective or was below the accepted standard in the industry * * *." (Findings of Fact and Conclusions of Law, p. 2.) The trial court cited Oliver's testimony that non-pressure fittings are used in the industry. The trial court also rejected Appellant's argument that placing the pipes in the "originally installed location" was below accepted industry standards. The court stated that "the testimony was that [the lines] were pressure tested and the lines which needed refitted and glued were refitted and glued by the defendant. The lines were then retested and it was represented to the defendant that the lines held the proper pressure." (5/28/09 J.E., pp. 1-2.) The trial court further found that "the plaintiff has not proven by a preponderance of the evidence that the defendant has committed an unfair or deceptive act or practice in connection with this transaction, as the same are enumerated under Ohio Revised Code Section 1345.02." (Findings of Fact and Conclusions of Law, p. 3.) This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

**{¶44}** "The Trial Court's Finding that Defendant Did Not Breach the Repair Contract Was Against the Manifest Weight of the Evidence."

## ASSIGNMENT OF ERROR NO. 2

**{¶45}** "The Trial Court's Finding that Defendant Did Not Breach the Repair Contract Was Contrary to Law."

**{¶46}** For ease of discussion, we will address these assignments together. As regards the first assignment, our standard of review is fairly deferential to the trial court. In *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d

578, at the syllabus, the Ohio Supreme Court set forth the standard of review for civil manifest weight of the evidence cases, stating, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."

{¶47} An appellate court must presume that the factual findings of the trial judge in a bench trial are correct since the trial judge had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. If the evidence is susceptible to more than one interpretation, we must construe it consistently with the trial court's judgment. *Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 584, 653 N.E.2d 639.

{¶48} To establish a breach of contract, the plaintiff has the burden to demonstrate by a preponderance of the evidence that a contract existed, that plaintiff fulfilled his obligations, that defendant failed to fulfill his obligations and that damages resulted from this failure. *McCullion v. Ohio Valley Mall* (Feb. 10, 2000), 7th Dist. No. 97CA175. "In service contracts, the failure to perform the service in a workmanlike manner using ordinary care constitutes the breach of an implied duty imposed by law." *John Snyder, Inc. v. Cooper* (March 20, 2001), 7th Dist. No. 99 JE 45, *1, citing *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 378-379. "In determining this breach of duty, the trier of fact must assess fault and address factual

issues on whether the defendant utilized proper materials and workmanlike skill and judgment." Id., citing *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 73.

**{¶49}** Appellant argues that the trial court abused its discretion because it misconstrued the evidence offered at trial. Appellant contends that the trial court's findings are in direct conflict with the evidence, because the trial court found that Appellant contracted with Rawson "to install new lines at an elevation *above* the lines of [Appellee]." (Emphasis added.) (Findings of Fact and Conclusions of Law, p. 2.) The facts of the case establish that Rawson installed the new lines below Appellee's lines. Later in the findings of fact, the trial court stated that Appellant failed to establish "that placing the pipes or allowing the pipes to remain in the *originally installed location* was below the accepted industry standards." (Emphasis added.) (Findings of Fact and Conclusions of Law, p. 2.) The evidence established that Appellee installed the lines above the depth of the installation of the original lines. But for these errors, Appellant contends that the trial court would have been compelled to conclude that Appellee breached the oral contract.

**{¶50}** Appellant further argues that the trial court's decision is contrary to law because the evidence in this case established that the lines installed by Appellee did not hold pressure after the cement was poured. Because she claims that the lines were within Appellee's exclusive control, Appellant contends that she has proven her breach of contract claim.

**{¶51}** Appellant correctly argues that the trial court mischaracterized the evidence at trial regarding the depth that the lines were buried by Appellee and Rawson respectively. Appellee conceded that the first set of lines he installed was

buried approximately four feet deep, and the second set of lines he installed was buried approximately one foot into the ground. Clark explained that the second set of lines was not installed as deep as the first set because Appellee did not want to use the backhoe.

{¶52} Despite the trial court's mischaracterization of the foregoing evidence, we find that Appellant failed to establish the elements of her breach of contract claim. To carry her burden at trial, Appellant had to establish by a preponderance of the evidence that Appellee's lines were installed in an unworkmanlike manner and that she suffered damages as a result of Appellee's substandard work.

{¶53} The breach of contract claim suffers from a series of evidentiary problems. First, because Appellant never identified the specific lines that were installed by Appellee, it is not clear from the record that the lines replaced by Rawson were the same lines as those installed by Appellee. Rawson conceded at trial that he could not identify the contractor who installed the pipes that he replaced or even the age of the pipes.

{¶54} Second, assuming arguendo that the lines replaced by Rawson were the lines installed by Appellee, no witness testified at trial that any of the lines were leaking after Appellee's installation. The record contains conflicting evidence regarding the number of lines that were replaced and the reasons for their replacement. Appellant testified that they had to "take out" all of the lines that Appellee installed. In the chronology of events and the certified letter, Appellant claims in writing that four of the lines installed by Appellee were leaking. The contract between Appellant and Rawson reads, "Dream Design will replace all lines

and fittings that are leaking or are not proper pressure fittings/also we will tear out and replace all concrete up to 4 yards to uncover lines * * *." (Plaintiff's Exh. 8, p. 1.) While it is clear Appellant's pool leaked somewhere after Appellee finished working on it, there is no real connection between the leak or leaks and Appellee's work. The number of Appellee's lines that were replaced is not clear from the record, and it is also not clear whether they were replaced because they were leaking or because they did not have acceptable fittings. The exact portion of the pipe and/or fitting that leaked is never identified.

{¶55} The only testimony Rawson provided with respect to any damage to the lines was the line depicted in Plaintiff's Exhibit 22. However, as stated earlier, that photograph shows no obvious damage. The only photographs that illustrate actual damage to the pool are Plaintiff's Exhibit 15 and 17, but Rawson offered no testimony about the threaded plastic collar in those exhibits. Appellee was the only witness who provided an explanation for the damage to the collar, and he claimed that the damage was caused by Oliver when he installed the new pool liner.

{¶56} Although Appellant offered Rawson's general testimony that Appellee did not install the pipes in a workmanlike manner, she did not connect Appellee's allegedly substandard work to any specific damage to the pipes, with the exception of the line depicted in Plaintiff's Exhibit 22. However, the trial court could have examined that exhibit and concluded that it did not illustrate any actual damage. Likewise, the trial court could have credited Appellee's testimony that the only visible damage to the pool, the threaded plastic collar depicted in Plaintiff's Exhibits 15 and 17, was caused by Oliver when he installed the new liner.

{¶57} Finally, assuming arguendo that the lines installed by Appellee were leaking, there was conflicting testimony at trial as to whether Appellee installed the lines in an unworkmanlike manner. In the judgment entry, the trial court credited Oliver's testimony that some contractors use non-pressure fittings for pool lines. The trial court may have also credited the testimony offered at trial that yellow glue and clay backfill are used by contractors in the pool industry, and that backfilling the pool with the original fill did not constitute substandard work.

{¶58} In summary, Appellant failed to identify the lines installed by Appellee, and failed to establish that these lines leaked or were damaged. It was not sufficient to claim that because the pool leaked after Appellee worked on it, Appellee must have caused the leak. Appellant very clearly bears the burden of proof to establish the casual connection, here. Even assuming that there was sufficient evidence to establish that the lines Appellee installed subsequently leaked, there was at least some competent, credible evidence to support the trial court's conclusion that Appellee's work was not substandard and/or was not the cause of the leak. Appellant's own witnesses testified that some people use non-pressure fittings and yellow glue. Appellee testified that he used the original backfill and that Rawson's lines were not seated on virgin soil. Finally, the only actual damage to the pool directly established at trial was attributed by Appellee to Oliver's installation of the liner. Because the evidence offered at trial was susceptible to more than one interpretation, we must construe it consistently with the trial court's judgment. *Cent. Motors Corp., supra.* Accordingly, Appellant's first and second assignments of error are overruled.

## ASSIGNMENT OF ERROR NO. 3

{¶59} "The Trial Court's Finding that Defendant Did Not Violate Ohio's Consumer Sales Practices Act Was Against the Manifest Weight of the Evidence."

{¶60} The CSPA is a remedial law designed to compensate for traditional consumer remedies and must be liberally construed pursuant to R.C. 1.11. *Einhorn v. Ford Motor Co.* (1990), 48 Ohio St.3d 27, 29, 548 N.E.2d 933. R.C. 1345.02(A) reads, "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.02(B) provides a list of representations that are considered deceptive, but further provides that the list in no way limits "the scope of division (A) * * *." R.C. 1345.03(A) provides that suppliers are not to "commit an unconscionable act or practice in connection with a consumer transaction." R.C. 1345.03(B) lists factors to consider in determining whether an act or practice is unconscionable.

{¶61} In addition to the factors found in the statute, there are two other sources that may be used to establish violations of the CSPA: the Ohio Attorney General and the judiciary. See R.C. 1345.09(B); *Frey v. Vin Devers, Inc.* (1992), 80 Ohio App.3d 1, 6, 608 N.E.2d 796. R.C. 1345.05(A)(3) provides that the attorney general shall "[m]ake available for public inspection * * * all judgments, including supporting opinions, by courts of this state * * * that * * * violate [R.C.] 1345.02 [or] 1345.03[.]"

{¶62} Pursuant to R.C. 1345.09(F)(2), a "court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed, if * * *

[t]he supplier has knowingly committed an act or practice that violates this chapter." "Knowledge" is defined as "* * * actual awareness, but such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness." R.C. 1345.01(E). An award of attorney fees is discretionary with the trial court. *Brzezinski v. Feuerwerker* (Sept. 14, 2000), 8th Dist. No. 74288, *5.

**{¶63}** Appellant contends that the trial court erred in awarding judgment in favor of Appellee on her CSPA claims. Specifically, she asserts that Appellee admitted that he did not provide an initial disclosure form, as required by O.A.C. 109:4-3-05(A)(1); Appellee admitted that he did not provide an itemized list of parts, as required by O.A.C. 109:4-3-05(D)(12); and Appellee refused to correct substandard work, which is an unfair and deceptive act in violation of R.C. 1345.02. See *State ex rel. Celebrezze v. Goldstein* (June 20, 1983), No. 53110, *2.

**{¶64}** As we have concluded that some competent, credible evidence appears in the record to support the trial court's conclusion that Appellee's work was not substandard, her claim based on *Celebrezze* must fail. However, her statutory claims have merit.

**{¶65}** O.A.C. 109:4-3-05, captioned "Repairs or services," reads, in pertinent part:

**{¶66}** "(A) It shall be a deceptive act or practice in connection with a consumer transaction involving the performance of either repairs or any service where the anticipated cost exceeds twenty-five dollars and there has been face to face contact between the consumer or the consumer's representative and the

supplier or the supplier's representative, prior to the commencement of the repair or service for a supplier to:

**{¶67}** "(1) Fail, at the time of the initial face to face contact and prior to the commencement of any repair or service, to provide the consumer with a form which indicates the date, the identity of the supplier, the consumer's name and telephone number, the reasonably anticipated completion date and, if requested by the consumer, the anticipated cost of the repair or service  The form shall also clearly and conspicuously contain the following disclosures in substantially the following language:

**{¶68}** " 'Estimate

**{¶69}** You have the right to an estimate if the expected cost of repairs or services will be more than twenty-five dollars.  Initial your choice:

_____ written estimate
_____ oral estimate
_____ no estimate' "

**{¶70}** Although the evidence adduced at trial demonstrates that Appellee twice violated this administrative code section, Appellant failed to prove any actual damages flowed from the violations.  Even if she suffered no actual damages, Appellant is entitled to $200 in statutory damages for each violation of the CSPA pursuant to R.C. 1345.09(B).  The June 9, 2008 receipt does not fulfill the requirements of the code section, and Appellee provided no receipt for the additional work.  Based on the record, Appellant is entitled to statutory damages totaling $400.00.

**{¶71}** O.A.C. 109:4-3-05 further reads, in pertinent part:

{¶72} "(D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:

{¶73} "(12) Fail to provide the consumer with a written itemized list of repairs performed or services rendered, including a list of parts or materials and a statement of whether they are used, remanufactured, or rebuilt, if not new, and the cost thereof to the consumer, the amount charged for labor, and the identity of the individual performing the repair or service[.]"

{¶74} Although the evidence adduced at trial demonstrates that Appellee twice violated this administrative code section, Appellant again failed to prove any actual damages flowed from the violations. Even if she suffered no actual damages, Appellant is entitled to $200 in statutory damages for each violation of the CSPA pursuant to R.C. 1345.09(B). The June 9, 2008 receipt does not fulfill the requirements of the code section, and Appellee provided no receipt for the additional work. Therefore, Appellant is entitled to statutory damages totaling $400.00 for this violation, also.

{¶75} Finally, Appellant asked for attorney fees based upon her CSPA claims. Because the trial court did not consider Appellant's request, this matter must be remanded to allow the trial court to consider whether an award of attorney fees is warranted in this case. In order to award attorney fees, the trial court must find that Appellee knowingly violated the statute. However, the Supreme Court has interpreted that language to mean, "the supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know

that his conduct violates the law for the court to grant attorney fees." *Einhorn v. Ford Motor Co.* (1990), 48 Ohio St.3d 27, 30, 548 N.E.2d 933.

{¶76} In conclusion, while the evidence and testimony in this case conflict, there is competent, credible evidence to support the judgment on the breach of contract claim. Consequently, Appellant's first and second assignments of error are overruled, and the judgment of the trial court is affirmed on the breach of contract claim. Likewise, the third assignment of error, as it pertains to Appellee's refusal to correct substandard work, is overruled. However, Appellant's third assignment of error is sustained in part, as it relates to Appellee's statutory violations of the CSPA. The judgment of the trial court is affirmed in part, and reversed in part on the CSPA claim, and judgment is entered in favor of Appellant in the amount of $800.00. Finally, because Appellant sought attorney fees based on the CSPA claim, this matter is remanded to the trial court to consider Appellant's request for attorney fees.

Donofrio, J., concurs.

Vukovich, P.J., concurs.

APPROVED:

_____
CHERYL L. WAITE, JUDGE