OPINION
{¶ 1} Defendant-appellant, Duffy Homes, Inc. ("Duffy Homes"), appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiffs-appellees, Gail L. Booth and Calvin L. Booth (collectively, "the Booths"), on the Booths' claim for breach of warranty. The Booths conditionally cross-appeal from the trial court's entry of summary judgment in favor of Duffy Homes on the Booths' claim for violation of the Ohio Consumer Sales Practices Act, R.C. 1345.01, et seq. ("CSPA"). Because the trial *Page 2 
court erred by failing to properly instruct the jury on the applicable measure of damages, we reverse. However, we affirm the trial court's grant of summary judgment in Duffy Homes' favor on the Booths' CSPA claim.
 {¶ 2} The facts underlying this action are straight-forward and, for the most part, undisputed. On July 2, 2002, the Booths entered into a contract with Duffy Homes to purchase a "spec" home for $410,000. The purchase contract contained express, limited warranties, including that "[s]eller will warrant against inadequate lot drainage."
 {¶ 3} Issues regarding lot drainage first came to Duffy Homes' attention during excavation of the home's basement, when the Field Supervisor, Tracy Scott Smith, noticed water coming from underground into the excavation. Smith contacted Geotechnical Consultants, Inc. ("GCI"), a geotechnical engineering firm. On behalf of GCI, James E. Rosebrook, P.E., visited the home site in July 2001 and issued recommendations for dealing with the drainage issues. Rosebrook recommended installing a gravity drain system[1] and two or three sump pumps, installing a gravel perimeter drainage system, and adding reinforcing bars in the home's footers. Rosebrook also recommended that Duffy Homes raise the home's footing grade. Duffy Homes complied with Rosebrook's recommendations. Duffy Homes installed a gravity drain system, two sump pumps, and a perimeter drain. Duffy Homes also placed reinforcing steel bars in the footers and raised the footer elevation.
 {¶ 4} As originally installed, the sump pumps in the basement were elevated over the gravity drain discharge so that they would run only when the water level in the sump crocks rose above the gravity drain discharge. To provide the *Page 3 
necessary elevation, the sump pumps were installed on bricks placed in the bottom of the sump crocks. During their walkthrough of the home prior to closing, neither the Booths nor their inspector noted any problem with the sump pumps, which, if running, were running quietly. Ultimately, the Booths completed the purchase.
 {¶ 5} In August 2002, the Booths contracted with Accurate Plumbing to install battery backups for the sump pumps. In the course of that work, the plumber removed the bricks from underneath the sump pumps, lowering the pumps below the gravity drain discharge. Thereafter, the pumps ran continuously, and the Booths complained to Duffy Homes about the resulting noise. In response, Duffy Homes had larger sump pumps installed and, subsequently, sealed the pumps to minimize the noise. Duffy Homes also replaced the sump pumps on multiple occasions when they burned out. Although the larger pumps ran less frequently, Mrs. Booth testified that the noise from the sump pumps could still be heard throughout the home.
 {¶ 6} On March 21, 2006, the Booths filed a complaint against Duffy Homes in the Franklin County Court of Common Pleas, asserting the following claims: (1) violation of the CSPA; (2) breach of warranty; (3) breach of contract; (4) negligence; and (5) fraud. In their complaint, the Booths alleged certain defects in the home, including "excessive water around [t]he [h]ome's foundation, water infiltration into the basement, the entry of excessive amounts of water into their basement drainage system and the improper and inadequate design and installation of the drainage system and grading." The Booths also contended that they were unable to finish or fully utilize their basement because of concerns regarding water surrounding and impacting the home's foundation. Duffy Homes filed an answer on June 15, 2006, and moved for summary judgment on September 22, 2006. *Page 4 
 {¶ 7} In November 2006, prior to the trial court's ruling on Duffy Homes' motion for summary judgment, the Booths' counsel hired CTL Engineering, Inc. ("CTL") to inspect subsurface conditions on the Booths' property. A CTL engineer observed the home and surrounding area and made test borings to determine the presence of ground water and the expected level of water with respect to the basement floor. C.K. Satyapriya, a geotechnical engineer and president of CTL, prepared a subsurface investigation report, dated November 15, 2006, based on the inspection data. Satyapriya concluded that there was groundwater relatively close to or a little higher than the basement floor elevation and made recommendations for remedial measures. Satyapriya recommended the following options: (1) connecting the drains or the sump crocks directly to the storm sewer in front of the house using a gravity drain system; (2) raising the finished floor of the basement level if needed to facilitate operation of a gravity drain system; or, most expensively, (3) installing "a below grade barrier around the residence particularly in the rear and the two sides" using sheet piles and creating "a bath tub effect around the structure." Satyapriya's report states that "[d]etails for any one of the alternatives are beyond the scope of this investigation." At trial, Satyapriya testified that the cost of the "bath tub effect" solution would be approximately $300,000 "[i]f you want to surround the entire house." (Tr. 181.)
 {¶ 8} On January 5, 2007, the trial court granted summary judgment in favor of Duffy Homes on the Booths' negligence and CSPA claims. A jury trial commenced on June 25, 2007, and, at the conclusion of the Booths' case, the trial court directed a verdict in favor of Duffy Homes on the Booths' fraud claim, leaving only the breach of *Page 5 
warranty/contract claim[2] for submission to the jury. The evidence was undisputed that at the time of trial, there had not been any actual, physical damage to the home's foundation. The Booths sought damages to compensate them for the costs to repair the drainage system so that damage to the home's foundation would not occur in the future.
 {¶ 9} Prior to trial, Duffy Homes submitted proposed jury instructions to the trial court, including the following:
 * * * If the damage to the property is temporary and such that the property can be restored to its original condition, then the owner may recover the reasonable cost of these necessary repairs. If, however, these repair costs exceed the difference in the fair market value of the property immediately before and after the damage, then this difference in value is all that the owner may recover.
 {¶ 10} The trial court did not give the damages instruction requested by Duffy Homes. Instead, the trial court instructed the jury on the applicable measure of damages, as follows:
 In a breach of contract case, damages may be awarded in an amount you find is sufficient to place Mr. and Mrs. Booth in the same position in which they would have been if their contract had been fully performed by Duffy Homes. Damages must, however, be limited to those damages that are reasonably certain and reasonably foreseeable.
 You may only award damages that were the natural and probable result of the breach of the contract or that were reasonably within the contemplation of the parties as the probable result of the breach of the warranty in the home purchase contract.
 * * *
 Finally, members of the jury, you may only award damages whose existence and amount have been proven to you by *Page 6 
the plaintiffs with reasonable certainty. You may not award damages that are remote or merely speculative.
(Tr. 468-469.)
 {¶ 11} On June 28, 2007, the jury returned a general verdict in favor of the Booths in the amount of $300,000. In interrogatory responses, the jury found that: (1) Duffy Homes breached its written limited warranty, (2) the Booths did not actively interfere or prevent Duffy Homes from meeting its obligations under the warranty, (3) the Booths sustained damages of $300,000 as a direct result of Duffy Homes' breach, and (4) none of the damage award was for emotional distress. The trial court entered judgment in accordance with the jury verdict on July 26, 2007.
 {¶ 12} In its appeal, Duffy Homes asserts two assignments of error:
 Appellant's First Assignment of Error: The Court Erred by Failing to Instruct the Jury on the Proper Measure of Damages Under Ohio Collieries Co. v. Cocke National Coal Co., 107 Ohio St. 238
(1932).
 Appellant's Second Assignment of Error: The Verdict is Not Supported by the Manifest Weight of the Evidence.
Duffy Homes' arguments on appeal concern only the award of damages and do not contest the finding of liability for breach of warranty. In their conditional cross-appeal, the Booths' single assignment of error states:
 The trial court erred in granting partial summary judgment in favor of Defendant/Cross-Appellee dismissing Plaintiffs/Conditional Appellants' claim for relief under the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Revised Code Section 1345.01, et seq.
 {¶ 13} In its first assignment of error, Duffy Homes contends that the trial court erred by failing to instruct the jury on the proper measure of damages. We agree. *Page 7 
 {¶ 14} A trial court has the duty to instruct the jury on the applicable law on all issues raised by the pleadings and evidence.Marshall v. Gibson (1985), 19 Ohio St.3d 10, 12; Groob v. Keybank,108 Ohio St.3d 348, 2006-Ohio-1189, at ¶ 32. A trial court must give jury instructions that correctly and completely state the law. A jury charge should be "a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced."Marshall, at 12, citing Parmlee v. Adolph (1875), 28 Ohio St. 10, paragraph two of the syllabus. Furthermore, "[a] charge ought not only be correct, but it should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury." Id., citingAetna Ins. Co. v. Reed (1877), 33 Ohio St. 283, 295.
 {¶ 15} Whether jury instructions correctly state the law is a question of law that an appellate court reviews de novo. State v. Calderon, Franklin App. No. 05AP-1151, 2007-Ohio-377, at ¶ 55. Although an instruction may not be a full and comprehensive statement of the law, as long as it correctly states the law pertinent to the issues raised in the case, its use is not reversible error. Henderson v. Spring RunAllotment (1994), 99 Ohio App.3d 633, 638. However, an inadequate jury instruction that misleads the jury constitutes reversible error.Groob, at ¶ 32; Marshall, at 12, citing Columbus Ry. Co. v. Ritter
(1902), 67 Ohio St. 53.
 {¶ 16} Duffy Homes asserts that the trial court erred by not instructing the jury on the measure of damages for injury to real property set forth in Ohio Collieries Co. v. Cocke (1923),107 Ohio St. 238. In essence, Duffy Homes contends that the trial court erred by failing to instruct the jury that the Booths' damages were limited by the diminished value of their property resulting from the breach of warranty or, at least, that damages may not be grossly disproportionate to the value of the property. As a result, *Page 8 
Duffy Homes contends that the $300,000 judgment, which is nearly three-quarters of the purchase price of the Booths' home, is an unsupportable windfall, particularly given the undisputed evidence that there has not been any actual, physical damage to the home.
 {¶ 17} In Ohio Collieries, a case against a coal company for damages caused by the removal of subjacent support from the plaintiff's land, the Supreme Court of Ohio stated the rule "as to the measure of damages in subsidence cases" as follows:
 If the injury is of a permanent or irreparable nature, the measure of damages is the difference in the market value of the property as a whole, including the improvements thereon, before and after the injury. If the injury is susceptible of repair, the measure of damages is the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure.
Id. at 248-249.
 {¶ 18} Although Ohio Collieries expressly stated a rule for use "in subsidence cases," Ohio courts have generally applied the OhioCollieries rule to a wide range of cases involving alleged damages to real property. Reeser v. Weaver Bros., Inc. (1992), 78 Ohio App.3d 681,691 ("Ohio Collieries remains the definitive statement of the general rule of the measure of damages for permanent and temporary injury to real property."). This court has also stated, generally, that "[t]he proper methods for calculating damage to real property in Ohio are set forth in the case of [Ohio] Collieries Co." Miller v. United AutoWorkers Local (May 3, 1979), Franklin App. No. 78AP-743. See, also, e.g., Horner v. Whitta (July 27, 2000), Seneca App. No. 13-99-64 (trespass); Hines v. Kline Eng. (July 2, 1998), Greene App. No. 97-CA-123 (negligence, breach of *Page 9 
contract); Smith v. Coldwell Banker Hunter Realty, Summit App. No. 20908, 2002-Ohio-4866 (fraud, CSPA); Martin v. Lake Mohawk Prop. Owners'Assn., Inc., Carroll App. No. 06-CA-841, 2007-Ohio-6432 (violation of property owners association restriction); Price v. Parker (Mar. 9, 2000), Franklin App. No. 99AP-298 (nuisance).
 {¶ 19} Although the majority of cases applying the OhioCollieries measure of damages involved tort claims, this court has specifically applied the rule to an alleged breach of an express warranty in a real estate purchase contract. As stated by the court inHilty v. Synerco Properties (Sept. 20, 1979), Franklin App. No. 79AP-245:
 To rule on defendant's second assignment of error, we must first determine the proper measure of damages. We considered the proper measure of damage when real property is involved in Miller v. United Auto Workers Local, et al * * * Although the Miller case sounded in tort, the principles of compensation used in Miller apply in a contract action as well. Because the "injury" in the present case is susceptible of repair, the preferred measure of damage is the cost of repair, unless the cost of repair exceeds the difference between the market value of the property in good repair and the market value as actually delivered with defects.
 {¶ 20} Although Ohio Collieries established the general rule for the measure of damages in cases involving injury to real property, this court has noted the need for some flexibility in applying the rule. In some circumstances, the diminution in market value may not be an absolute limit on the recovery of damages to real property. For example, in Thatcher v. Lane Constr. Co. (1970), 21 Ohio App.2d 41, this court considered whether the Ohio Collieries rule was an absolute bar to damages that exceeded the difference in market value of the real property immediately before and immediately after the injury. In affirming a damage award that exceeded the diminution in market value of the real property, the court stated that the Ohio Collieries rule is "not *Page 10 
an arbitrary or exact formula to be applied in every case without regard to whether its application would compensate the injured party fully for losses which are the proximate result of the wrongdoers conduct." Id., at 48-49. Therefore, the Thatcher court affirmed the trial court's judgment for the $1,750 replacement cost of destroyed trees, despite evidence that the removal of the trees diminished the market value of the property by only $1,000. See, also, Northwestern Ohio Nat. Gas Co.v. First Congregational Church (1933), 126 Ohio St. 140 (permitting recovery of damages resulting from injury to real property with no market value); Prawdzik v. II Ent., Inc., Franklin App. No. 03AP-1044,2004-Ohio-3318, at ¶ 13.
 {¶ 21} Although diminution in market value may not always be an absolute limit on the recovery of damages to real property, the costs of repair may not be grossly disproportionate to the value of the property.Prawdzik; Montgomery v. Proper (Feb. 14, 1977), Huron App. No. H-96-019 (reasonable repair costs may not be grossly disproportionate to the value of the property); Bartholet v. Carolyn Reilly Reality, Inc.
(1998), 131 Ohio App.3d 23, at 27 ("[E]ven when an award somewhat higher than the diminution in value of the property might be appropriate, the restoration costs awarded must not be grossly disproportionate expenditures.").
 {¶ 22} In the case at bar, the Booths asserted a claim for breach of warranty. They sought monetary damages for injury to real property resulting from that breach. Specifically, the Booths sought to recover the cost to restore the property to the warranted condition. The Booths presented evidence that the cost to restore the property to the warranted condition was $300,000. It was undisputed that the Booths purchased the home for $410,000. The trial court was obligated to instruct the jury on the correct measure of damages applicable to the Booths' claim. Ohio Collieries states *Page 11 
the general rule for the measure of damages for injuries to real property. Even if the evidence may have justified a modified OhioCollieries instruction (i.e., permitting a damage award greater than the diminution in market value if necessary to fully compensate the Booths), the law would still not permit a damage award grossly disproportionate to the value of the Booths' home. Because the trial court failed to instruct the jury on the applicable measure of damages in this case, the trial court erred. The fact that the Booths failed to present any evidence of the diminution in market value does not relieve the trial court of its obligation to accurately instruct the jury on the applicable law.
 {¶ 23} The Booths contend that the Ohio Collieries rule is inapplicable here and that the trial court appropriately instructed the jury on the measure of damages. The Booths offer three bases for their position. First, they argue that Ohio Collieries applies only when there has been actual physical damage to real property. Next, they argue that Ohio courts do not apply the Ohio Collieries rule as a formulaic criterion in every case. Finally, they argue that application of theOhio Collieries rule would deny them adequate compensation for their loss. We find the Booths' arguments unpersuasive.
 {¶ 24} The Booths first contend that Ohio Collieries is inapplicable because there has been no actual, physical damage to the home, although they maintain that damage will occur in the future absent preventative measures. While most cases applying the Ohio Collieries rule involved situations where there was actual physical damage to the real property as a result of the defendant's conduct, Ohio courts have not limited application of the Ohio Collieries rule to such cases. For example, inHines, the Second District Court of Appeals applied the OhioCollieries rule in a negligence claim against a surveyor who erred in determining the 100-year flood level for a parcel of real estate *Page 12 
upon which the plaintiffs built a home. In addressing whether the plaintiffs proved damages, the Hines court acknowledged the applicability of the Ohio Collieries rule and noted that "Ohio law would not require [the plaintiffs] to wait until flood waters entered their house before they could prove damages." See, also, Martin, supra (holding that Ohio Collieries established the applicable rule for measuring damages to real property despite the absence of physical damage). Nor can we discern a reason why the Ohio Collieries measure of damage should not apply even though the real property has not suffered actual, physical damage. Accordingly, we find that the absence of current, physical damage to the home does not render the general measure of damages set forth in Ohio Collieries inapplicable to the Booths' breach of warranty claim.
 {¶ 25} In their second and third arguments against application of theOhio Collieries rule, the Booths contend that the rule should not be applied in a formulistic way in every case and that applying the rule here would deny them full compensation for the injury to their property. In essence, the Booths simply argue for the application of a different measure of damages than the general rule set forth in OhioCollieries. This argument ignores the fact that "Ohio Collieries remains the definitive statement of the general rule of the measure of damages for permanent and temporary injury to real property." Reeser, supra, at 691.
 {¶ 26} As we noted above, in some circumstances, the diminution in market value discussed in Ohio Collieries may not be an absolute limit on the recovery of damages for injury to real property. Where such a limitation would prevent fair compensation, this court has permitted damage awards that exceed the diminution in market value. However, the relationship between the repair costs and the diminution in market value of the real property remains a benchmark consideration for the trier of fact *Page 13 
in awarding damages. Even when there is evidence that might justify a damage award greater than the diminution in market value, the damage award cannot be grossly disproportionate to the value of the real property. Prawdzik, supra; Bartholet, supra. Therefore, the principles articulated in Ohio Collieries remain the foundation for the measure of damage resulting from injuries to real property. By failing to give a jury instruction based upon Ohio Collieries, the trial court failed to accurately instruct the jury on the applicable law, thereby misleading the jury. Accordingly, we sustain Duffy Homes' first assignment of error.
 {¶ 27} In its second assignment of error, Duffy Homes contends that the jury's award of $300,000 was against the manifest weight of the evidence. Because we have held that the trial court committed prejudicial error in its charge to the jury on the applicable measure of damages, thereby requiring a reversal of the damage award and a remand for a new trial on damages, Duffy Homes' second assignment of error is moot.
 {¶ 28} Lastly, we turn to the Booths' cross-appeal and their single assignment of error concerning the trial court's entry of summary judgment in favor of Duffy Homes on the Booths' CSPA claim.
 {¶ 29} We review a summary judgment de novo. Koos v. Cent. OhioCellular, Inc. (1994), 94 Ohio App.3d 579, 588, citing Brown v. SciotoCty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107; Brown, at 711. We must affirm the trial court's judgment if any grounds the moving *Page 14 
party raised in the trial court support it. Coventry Twp. v. Ecker
(1995), 101 Ohio App.3d 38, 41-42.
 {¶ 30} Pursuant to Civ. R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66.
 {¶ 31} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt, 75 Ohio St.3d 280, 292,1996-Ohio-107. Once the moving party meets its initial burden, the nonmoving must set forth specific facts demonstrating a genuine issue for trial. Id., at 293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v.Reynoldsburg, 65 Ohio St.3d 356, 358-359, 1992-Ohio-95, quotingNorris v. Ohio Std. Oil Co. (1982), 70 Ohio St.2d 1, 2.
 {¶ 32} The Booths alleged that Duffy Homes violated the CSPA, which prohibits unfair, deceptive, or unconscionable acts or practices of suppliers in connection with *Page 15 
consumer transactions. See R.C. 1345.02 and 1345.03. Duffy Homes moved for summary judgment on the Booths' CSPA claim, arguing that the Booths' allegations do not arise out of a consumer transaction but arise out of defects with the real property itself, which are not actionable under the CSPA. The Booths responded that, while the parties' transaction clearly involved the transfer of real estate, Duffy Homes' warranty against inadequate lot drainage constituted a "service" or "intangible" under the CSPA's definition of "consumer transaction." In granting summary judgment in favor of Duffy Homes, the trial court agreed with Duffy Homes that the parties' transaction was not a consumer transaction under the CSPA.
 {¶ 33} Because the Booths' argument regarding their CSPA claim revolves around the existence of a consumer transaction in this case, we first look to the CSPA's definition of that term. In R.C. 1345.01(A), the CSPA defines a "consumer transaction," in pertinent part, as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." From this definition, the Supreme Court of Ohio has found that the General Assembly clearly intended to exclude real estate from the CSPA. See Shore West Constr.Co. v. Sroka (1991), 61 Ohio St.3d 45, 48.
 {¶ 34} While the CSPA has no application in a pure real estate transaction, it does apply to mixed transactions that also involve the transfer of consumer goods or services. In Brown v. Liberty Clubs,Inc. (1989), 45 Ohio St.3d 191, syllabus, the Supreme Court of Ohio held that the CSPA applied to "the personal property or services portion of a mixed transaction involving both the transfer of personal property or services and the transfer of real property." In such transactions, the CSPA still has no *Page 16 
application to the real estate itself, which is not included in the definition of a consumer transaction. Morrison v. Skestos, Franklin App. No. 04AP-244, 2004-Ohio-6985, at ¶ 14 ("While the CSPA applies to the portion of a mixed transaction involving the transfer of goods or services, it is inapplicable to the portion of the transaction involving real property."). In Morrison, home purchasers brought an action against their builders, alleging fraud and a CSPA violation based on the builders' alleged failure to reveal contamination of the soil on which the home was built. This court acknowledged that construction of a residence is a "service" within the CSPA's definition of "consumer transaction" but affirmed the trial court's dismissal of the purchasers' CSPA claim because the claim related to alleged defects in the real property and not to defects in the builders' construction services.
 {¶ 35} The Second District Court of Appeals has explained the rationale for permitting CSPA coverage for residential construction service transactions as follows:
 We conclude that although the [CSPA] does not apply to isolated, "pure" real-estate transactions involving the purchase and sale of land and any pre-existing improvements, it does apply to transactions that include a contract to construct a residence, because (1) buyers of existing homes have the opportunity to inspect their purchases and evaluate the quality and extent of construction services and goods provided, whereas buyers of construction services have nothing to inspect at the time of the purchase and occupy the same position as homeowners buying construction goods and services, who are protected by the [CSPA]; (2) there is no substantial difference between residential construction and home improvement contracts, the latter having been held to be protected by the [CSPA]; and (3) there is no express authority for the exclusion of residential construction from [CSPA] coverage.
Keiber v. Spicer Constr. Co. (1993), 85 Ohio App.3d 391, 392. Although the Booths admit that this case does not involve the provision of construction services because *Page 17 
they contracted with Duffy Homes to purchase a completed home, they maintain that Duffy Homes' warranty against inadequate lot drainage amounts to a promise to perform services by repairing or replacing the drainage system if it proved inadequate. We disagree.
 {¶ 36} First, the express language of the warranty demonstrates that it is a warranty about the quality and condition of the real property rather than a promise to provide services. Secondly, the rationale for extending CSPA protection to purchasers of construction services, i.e., the purchasers' lack of opportunity to inspect before buying, is wholly absent here. See Rose v. Zaring Homes, Inc. (1997), 122 Ohio App.3d 739
(holding that a developer's representation that unimproved green space would be maintained north of the buyer's lot did not constitute a "service" under the CSPA and noting that the buyer had an unimpeded opportunity to inspect the public records about the realty in advance of purchase). Here, the Booths purchased a completed home and had a full opportunity to inspect the property before purchasing it. Lastly, the Booths' complaints regarding excessive ground water and improper lot drainage are related, not to the provision of any service by Duffy Homes, but to the defective condition of the real estate itself.
 {¶ 37} Upon review, we conclude that Duffy Homes' warranty about the quality and condition of the lot, as part of an otherwise pure real estate transaction, does not constitute a warranty to perform services, actionable under the CSPA. See Ruschau v. Monogram Properties, Warren App. No. CA2004-10-121, 2005-Ohio-6560, at ¶ 30 (holding that a warranty that land sold would provide adequate bearing capacity for a single family home did not constitute a transfer or assignment of a good or service to transform the sale from a pure real estate transaction). Because the Booths' CSPA *Page 18 
claim did not involve a consumer transaction, as defined by R.C. 1345.01(A), the trial court did not err in granting Duffy Homes' motion for summary judgment on that claim. Accordingly, we overrule the Booths' single assignment of error in their conditional cross-appeal.
 {¶ 38} For the foregoing reasons, we sustain Duffy Homes' first assignment of error, overrule as moot Duffy Homes' second assignment of error, and overrule the Booths' single assignment of error in their conditional cross-appeal. Furthermore, we reverse the $300,000 judgment in favor of the Booths and remand this matter for further proceedings to determine the amount of damages the Booths are entitled to recover for Duffy Homes' breach of warranty.
Judgment reversed and cause remanded.
SADLER, J., concurs. FRENCH, J., concurs in part and dissents in part.
[1] A gravity drain system involves connecting a drain or sump crock to a sewer line or catch basin at a lower elevation so that water will flow naturally to the sewer line or catch basin by gravity, without pumping it.
[2] The Booths' breach of warranty and breach of contract claims are essentially a single claim. The breach of contract claim merely alleged that, by breaching its warranty, Duffy Homes breached its purchase contract with the Booths.