318

LANDIS et al., Appellees,

v.

WILLIAM FANNIN BUILDERS, INC., Appellant;

84 Lumber Company, Appellee.

[Cite as *Landis v. William Fannin Builders, Inc.*,
193 Ohio App.3d 318, 2011-Ohio-1489.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–568.

Decided March 29, 2011.

320

Scherner & Sybert, L.L.C., and Dave Lackey, for appellees Landis et al.

MacMurray, Petersen & Shuster, L.L.P., Helen MacMurray, Shaun K. Petersen, and Erica Sherrick, for appellant.

Gillett Law Office, L.L.C., and Gary A. Gillett, for appellee 84 Lumber Company.

---

KLATT, Judge.

{¶ 1} Defendant-appellant, William Fannin Builders, Inc. ("Fannin Builders"), appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiffs-appellees, Steve Landis and Nancy Weidman, and third-party defendant-appellee, 84 Lumber Company ("84 Lumber"). For the following reasons, we affirm.

{¶ 2} In 2004, Landis and his wife, Weidman, decided to build a custom home on land that Landis owned in Pleasantville, Ohio. After interviewing three builders, they chose Fannin Builders to construct their home. On May 4, 2004, appellees signed a contract with Fannin Builders, in which Fannin Builders agreed to construct appellees' home in accordance with the plans and specifications attached to the contract for $356,750.

{¶ 3} The specifications for appellees' home called for T1–11 exterior siding covered with two coats of stain in a color of appellees' choice. T1–11 siding is a plywood siding with one-inch-deep vertical grooves spaced 11 inches apart. Appellees chose T1–11 siding for their home because it provided a more natural, rustic look than other types of siding. Before signing the construction contract, appellees sought, and received, assurances from Fannin Builders that it had experience with installing and staining T1–11 siding.

{¶ 4} For the most part, the contract specifications indicated certain types of materials appellees wanted (i.e., ceramic tile floors or marble countertops), but did not list specific brands, designs, or colors of the materials. Throughout construction, Fannin Builders would request that appellees choose the brands, designs, or colors as the home progressed to the point where Fannin Builders needed to install the materials. When the time came to apply the stain to the exterior siding, Fannin Builders provided appellees with a brochure entitled "Semi–Transparent & Semi–Solid Color Palettes for all Cabot Colors." The brochure depicted stains in over 30 colors, each available in two different pigment levels: semitransparent (lightly pigmented) or semisolid (extra pigment). Appellees chose a semitransparent stain in a green color, which Cabot, the stain manufacturer, named "allagash." Landis communicated his and his wife's choice to Fannin Builders in a September 2, 2004 e-mail.

{¶ 5} Fannin Builders subcontracted with 84 Lumber for the procurement and installation of the T1–11 siding. Unfortunately, 84 Lumber underestimated the amount of siding needed to completely clad appellees' home. Consequently, the company 84 Lumber hired to stain the T1–11 siding, Precision Applied Coating Enterprises ("PACE"), stained the 19 additional sheets separately from the majority of the siding. Although PACE stained both batches of siding with Cabot semitransparent allagash stain, one batch of siding turned out a noticeably darker hue than the other batch.

{¶ 6} Weidman visited the construction site after 84 Lumber delivered the siding, and she saw that one stack of siding appeared darker in shade than the other stack. Weidman asked Jeff Klinger, Fannin Builder's field superintendent, if the different color would be a problem. According to Weidman, Klinger answered "no" and assured her that a second coat of stain, applied after the siding was in place, would blend the two shades so that they would match.

{¶ 7} When installing the siding, 84 Lumber did not attempt to group same-colored siding together. Instead, 84 Lumber placed darker and lighter siding at random intervals around the perimeter of the house and unattached garage. As a result, appellees' home acquired a striped or patchwork appearance.

{¶ 8} The closing on appellees' home was scheduled for January 4, 2005. While Fannin Builders had substantially completed construction by that date, certain tasks remained undone. One of these tasks was the application of the second coat of stain on the siding. Fannin Builders told appellees that the stain should not be applied in temperatures below 50 degrees Fahrenheit, so appellees consented to delay application of the second coat of stain until spring 2005.

{¶ 9} At the closing, appellees paid Fannin Builders almost the entire contract price, withholding only $2,000 in escrow to be paid out once Fannin Builders finished all work on the house. During the closing, appellees received from Fannin Builders a number of documents, including a homeowner's manual, a 20–year limited warranty on the home's structural components, and a one-year limited warranty on various aspects of the home's materials and construction.

{¶ 10} Shortly after they moved into their new house, appellees observed workers applying a second coat of stain to the exterior siding outside their dining room. Appellees contend that eventually, the whole house and the garage received a second coat of stain. Although appellees did not see the entire staining process, they base their contention on the fact that green stain appears on all the grey trim that edges the siding. Because PACE stained the trim at its facility, the green stain on the trim could have come only from the sloppy application of a second coat of stain after both the siding and trim were installed.

{¶ 11} Contrary to Klinger's earlier assurances, the second coat of stain did not improve the patchwork appearance of the siding.[1] Appellees and Fannin Builders discussed various ways in which to fix the patchwork appearance. In spring 2005, appellees allowed Fannin Builders to remove siding from the back of the garage in order to try stain matching. The attempt was unsuccessful in producing a uniform color.

{¶ 12} On June 14, 2005, representatives from Fannin Builders, 84 Lumber, and PACE met at appellees' home to confer about the siding problem. At that meeting, 84 Lumber agreed to provide and install new siding, and PACE agreed to stain the new siding. In a letter to Fannin Builders dated August 2, 2005,

---

1. Fannin Builders contests appellees' contention that the siding received a second coat of stain. Rather than resolve this factual dispute, the trial court simply concluded that even if siding has only one coat of stain, a second coat of semitransparent stain would not have remedied the patchwork appearance of the siding.

Sean Horton, manager of the Westerville 84 Lumber store, set forth the terms of the agreement:

2. After completion all liability in the color related to this type of application be given unto the builder.

\* \* \*

4. Builder agrees that they understand there is no warrantee [sic] for the color stability, variance in the shades due to the nature of real wood and the semi-trans [sic] coating.

\* \* \*

6. 84 Lumber Company has gone through extensive means to ensure the product that will be supplied is made from the same mill within minutes of each other but we do not under any circumstances issue any statement that would lead anyone to believe that we have any control over the absorption rate and or the shades the t111 product will end up with.

\* \* \*

Per our discussions on the job site and on the phone with the Cabot Company you the builder should now understand the way a semi-trans [sic] stain is when it comes to variances in shade and color in a natural product such as t111 siding. 84 Lumber Company and Precision Applied Coatings are fixing this issue in good faith to the very best of our abilities but we cant [sic] accept another complaint of this nature with all the knowledge we have now imparted to you and the homeowner. This is the final and only fix we will be part of in this siding color matter.

{¶ 13} Both Horton and William Fannin Sr., the president of Fannin Builders, executed the letter agreement. Fannin faxed the letter agreement to Landis and asked him to sign it to acknowledge that he had read it and understood its terms. Landis did so.

{¶ 14} 84 Lumber delivered the replacement siding to appellees' home in early September 2005. When appellees examined the siding, they discovered that it was yellow, not green. Appellees contacted Fannin Builders immediately, explained that the siding was the wrong color, and stated that they did not want the siding installed without discussion of the problem.

{¶ 15} When subsequent communication with PACE revealed that PACE had, indeed, stained the replacement siding with the correct stain, appellees and Fannin Builders disagreed about the appropriate next course of action. Fannin Builders wanted to restain the siding on the house, while appellees advocated restaining the replacement siding. Landis told Fannin to delay any additional staining until they could arrive at a mutually agreeable solution. Despite Landis's instruction, a Fannin Builders' subcontractor attempted to blend the two

stain colors on the siding on the front of the garage. Both appellees and Fannin Builders agree that the result looked horrible.

{¶ 16} The same day that the subcontractor tried to fix the siding with additional stain, Fannin Builders had 84 Lumber remove the replacement siding from appellees' property. As Fannin later explained, he had 84 Lumber remove the replacement siding because appellees "rejected the color of the new siding [and] it makes no sense to put a siding on [the] home with a color [appellees] do not like and hope we can re-stain it to something acceptable." However, Fannin Builders did not inform appellees of its decision to recall the replacement siding or the reasoning behind that decision before implementing it.

{¶ 17} After discovering the botched fix and the absence of the siding, Landis e-mailed Fannin Builders instructing it not to do any additional work relative to the siding problem without appellees' prior notice and approval. In a telephone call following that e-mail, Scott Gramke, owner and general manager of PACE, suggested that a solid stain in the allagash color would cover the patchwork appearance of the siding. Appellees were reluctant to use a solid stain because it could not render the natural, rustic look that appellees wanted. Unlike a semitransparent stain, a solid stain masked, rather than highlighted, the grain and natural imperfections of the T1–11 siding. Nevertheless, Landis agreed to test the solid stain by applying it to a sheet of siding that appellees had taken from the replacement batch of siding. Unfortunately, appellees were displeased with both the color and opacity of the solid stain.

{¶ 18} Over the next year and a half, appellees and Fannin Builders periodically discussed potential solutions for fixing the patchwork appearance of the siding, but they could not come to any agreement. During this period, appellees filed a complaint against Fannin Builders with the Professional Standards Committee of the Building Industry Association of Central Ohio ("BIA"). After reviewing the matter, the BIA opined that the color variance in the siding on appellees' home did not comply with professional standards in the residential construction industry. The BIA also concluded that application of a solid stain would constitute a commercially reasonable repair of the siding.

{¶ 19} Ultimately, on April 11, 2007, appellees filed suit against Fannin Builders, alleging breach of contract, breach of the express limited warranty, and violation of the Ohio Consumer Sales Practices Act ("OCSPA"). Fannin Builders, in turn, filed a third-party complaint against 84 Lumber, alleging claims for breach of contract and indemnification. With the trial court's leave, Fannin Builders also later amended its answer to add a counterclaim against appellees for breach of contract and unjust enrichment. In the counterclaim, Fannin Builders alleged that appellees still owed it $3,908.98 for the construction of appellees' home.

{¶ 20} A bench trial on appellees' and Fannin Builders' claims occurred on March 1 and 2, 2010. Appellees Fannin, Horton, and Gramke testified to the facts recounted above. Appellees also adduced expert testimony that the color variance of the stain on the siding does not meet industry standards and that Fannin Builders is responsible for the unacceptable appearance of the siding. Moreover, appellees' expert testified that correction of the patchwork appearance requires complete removal and replacement of the siding.

{¶ 21} In its decision, the trial court found in appellees' favor on their breach-of-contract claim and against appellees on their claims for breach of the express limited warranty and violation of the OCSPA. Additionally, the trial court found in Fannin Builders' favor on its counterclaim for breach of contract and against Fannin Builders on its third-party claims for breach of contract and indemnity. The trial court determined that appellees' damages amounted to $66,906.24, and after setting off the $3,908.98 that appellees owed Fannin Builders under the construction contract, the trial court awarded appellees $62,997.26. The trial court reduced its decision to judgment on May 18, 2010.

{¶ 22} Fannin Builders now appeals from the May 18, 2010 judgment and assigns the following errors:

[1.] The Trial Court Erred as a Matter of Law by Concluding that Appellant Breached its Contract with Appellees when it provided a Semi–Transparent Oil–Based Stain that Simply did not Meet their Approval.

[a.] The Contract does not Contain a Satisfaction Clause.

[b.] Even if the Court Implies a Satisfaction Clause, the Court Should Apply an Objective Standard.

[2.] The Trial Court Erred as a Matter of Law by Failing to Consider Appellant's Right to Cure.

[3.] The Trial Court committed Reversible Error by not Assessing Damages Using "Diminished Value Standard," and by Creating a Remedy that Constitutes Economic Waste.

[4.] The Trial Court Erred as a Matter of Law by Concluding that Appellant is Barred from Seeking Indemnification When 84 [Lumber] Never Fulfilled its Obligations Pursuant to the Settlement Agreement Entered on August 2, 2005.

{¶ 23} By its first assignment of error, Fannin Builders argues that the trial court erred in ruling that it had breached its contract with appellees when it provided siding that did not meet appellees' approval. Fannin Builders misinterprets the trial court's ruling. The trial court actually held that Fannin Builders had breached the construction contract because it had failed to provide appellees "siding *with a uniform shade* of oil-based Cabot semi-transparent stain." (Em-

phasis added.) Thus, the patchwork appearance of the siding, not appellees' dissatisfaction with the siding, constitutes the breach of contract.

{¶ 24} Contracts for the future construction of a residence include a duty, implied by law, that the builder must perform its work in a workmanlike manner. *Kishmarton v. William Bailey Constr., Inc.* (2001), 93 Ohio St.3d 226, 228–229, 754 N.E.2d 785; *Jones v. Centex Homes,* 189 Ohio App.3d 668, 2010-Ohio-4268, 939 N.E.2d 1294, ¶ 9, appeal accepted for review, 127 Ohio St.3d 1531, 2011-Ohio-376, 940 N.E.2d 985. "This implied duty 'requires a construction professional to act reasonably and to exercise that degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar circumstances.' " *Jarupan v. Hanna,* 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 19, quoting *Seff v. Davis,* 10th Dist. No. 03AP–159, 2003-Ohio-7029, 2003 WL 22999406, ¶ 19. In determining whether a builder has breached its implied duty to perform in a workmanlike manner, a fact-finder must assess whether the builder used proper materials and workmanlike skill and judgment. *Gilham v. Stasiulewicz,* 7th Dist. No. 09 JE 25, 2010-Ohio-6407, 2010 WL 5545391, ¶ 48.

{¶ 25} In the case at bar, the parties do not dispute that the evidence establishes that Fannin Builders fell below local industry standards in constructing a house with siding of such disparate color. Fannin admitted that the siding is unacceptable under industry standards. The BIA report states that the color variance in the siding "does not comply with professional standard's [sic] in the residential construction industry." Finally, appellees' expert witness testified that the patchwork appearance of the siding does not meet industry standards. Given this evidence, we conclude that the trial court did not err in finding that Fannin Builders' failure to provide siding in a uniform color amounted to a breach of contract. Because the siding does not conform to industry standards, Fannin Builders breached its implied duty to perform in a workmanlike manner.

{¶ 26} Fannin Builders, however, contends that the color variance could not constitute a breach because Fannin Builders provided appellees with replacement siding that was uniform in color. Essentially, Fannin Builders argues that its belated performance under the contract vitiated its earlier defective performance. We disagree. Under contract law, a breach occurs when a party fails, without legal excuse, to perform a promise that forms a whole or part of a contract. *Natl. City Bank v. Erskine & Sons, Inc.* (1953), 158 Ohio St. 450, 49 O.O. 395, 110 N.E.2d 598, paragraph one of the syllabus. Here, Fannin Builders breached the contract when it constructed appellees' house with mismatched siding and thus failed to perform its promise to construct the house in a workmanlike manner. Fixing defective work may eliminate a nonbreaching party's injury, but it cannot negate the breach itself.

{¶ 27} Because the failure to provide siding of a uniform color, not the failure to please appellees, breached the contract, we reject Fannin Builders' contention that the trial court implied a satisfaction clause into the contract and found a breach of that clause. Accordingly, we overrule Fannin Builders' first assignment of error.

{¶ 28} By its second assignment of error, Fannin Builders argues that appellees cannot recover for breach of the contract because they refused to allow Fannin Builders to cure the breach. Fannin Builders bases its right to cure on a provision of the one-year limited warranty, which reads:

> The Builder warrants * * * that the construction was completed in accordance with the Quality Standards for the construction of a single family home as adopted by the Building Industry Association of Central Ohio, Inc.

> Within one year from the date of closing or occupancy by the Buyer, whichever is first to occur, the Builder will repair or replace, at Builder's option, any defects in material or workmanship as determined by the application of the above-referenced Quality Standards and as otherwise limited by the terms and conditions of this Limited Warranty.

According to Fannin Builders, because appellees prevented it from carrying out the promise to repair or replace contained in the limited warranty, appellees cannot take advantage of Fannin Builders' nonperformance. In other words, Fannin Builders contends that appellees' rejection of the sole remedy offered in the limited warranty precludes them from recovering damages for the mismatched siding.

{¶ 29} Although Fannin Builders depends upon a term of the limited warranty for its right to cure, the trial court concluded that no breach of the limited warranty occurred. Fannin Builders breached the duty of workmanlike conduct implicit in the construction contract, not the limited warranty requiring it to satisfy the BIA's Quality Standards. Consequently, the limited warranty does not apply to this case, and thus, it does not prevent appellees' recovery of damages. Accordingly, we overrule Fannin Builders' second assignment of error.

{¶ 30} By its third assignment of error, Fannin Builders argues that the trial court erred in awarding appellees damages based on the cost to replace the mismatched siding instead of the difference in the market value of the house as contracted for and as received. We disagree.

{¶ 31} Generally, the appropriate measure of damages in an action for a breach of a construction contract is the cost to repair the deficient work, that is, the cost of placing the building in the condition contemplated by the parties at the time they entered into the contract. *Hansel v. Creative Concrete & Masonry Constr. Co.* (2002), 148 Ohio App.3d 53, 59, 772 N.E.2d 138; *Barton v. Ellis*

(1986), 34 Ohio App.3d 251, 255, 518 N.E.2d 18. Some Ohio courts subscribe to an exception to this general measure of damages. Although never adopted by this court, various other Ohio appellate courts have applied the economic-waste rule to determine damages for the breach of a construction contract. *Angles v. West,* 4th Dist. No. 02CA16, 2003-Ohio-464, 2003 WL 203593, ¶ 9; *Scheider v. 1st Class Constr., Inc.,* 11th Dist. No. 2001–G–2380, 2002-Ohio-3368, 2002 WL 1400254, ¶ 14; *Capstone Homes, Inc. v. Ruffin* (Apr. 13, 2001), 2d Dist. No. 2000–CA–101, 2001 WL 369714; *Golden Giant, Inc. v. Rinehart* (Feb. 21, 2001), 3d Dist. No. 6–2000–07, 2001 WL 169085. Under the economic-waste rule, if repair of a construction defect "will involve unreasonable economic waste, damages are measured by the difference between the market value that the structure contracted for would have had and that of the imperfect structure received by the plaintiff." *Ohio Valley Bank v. Copley* (1997), 121 Ohio App.3d 197, 210, 699 N.E.2d 540. Economic waste arises when the total cost to remedy a construction defect is grossly disproportionate to the good to be attained. *Short v. Greenfield Meadows Assoc.,* 4th Dist. No. 07CA14, 2008-Ohio-3311, 2008 WL 2589659, ¶ 15; *Tru–Built Garage & Lumber Co. v. Mays* (Jan. 27, 1993), 2d Dist. No. 13432, 1993 WL 15664.

{¶ 32} The seminal case of *Jacob & Youngs, Inc. v. Kent* (1921), 230 N.Y. 239, 129 N.E. 889, best articulates the economic-waste rule. In that case, a contract for the construction of a house required the use of plumbing pipe manufactured in Reading. A subcontractor's oversight led to the installation of plumbing pipe manufactured in Cohoes, not Reading. Although Cohoes pipe equaled Reading pipe in quality, the homeowner demanded that the builder tear out the Cohoes pipe and replace it with Reading pipe. To tear out the pipe, the builder would have had to demolish substantial parts of the completed structure. When the builder refused to replace the Cohoes pipe with Reading pipe, the plaintiff sued. The court held that given the circumstances:

> [T]he measure of the allowance is not the cost of replacement, which would be great, but the difference in value, which would be either nominal or nothing. * * * The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value.

Id. at 244.

{¶ 33} The economic-waste rule emanates from courts' disinclination to award windfalls. 24 Lord, Williston on Contracts (4th Ed.2002) 469–470, Section 66:17. Sometimes, the owner of a defective structure receives sufficient value from the builder's work that he or she will decide not to fix the defect, and instead, will pocket any damages awarded based on the cost of repairs. The likelihood of this outcome increases in situations such as those presented in *Kent,* where the wrong

pipe was commensurate to the contracted-for pipe in both quality and functionality. In such situations, the injured party is unjustly enriched because he or she receives work of approximately equal value to the contracted-for work and, in addition, money damages based on the cost of repair. Restatement of the Law 2d, Contracts (1981), Section 348, Comment c (if "the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party," then "[d]amages based on the cost to remedy the defects would [ ] give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall"); *Champion Cos. of Wisconsin, Inc. v. Stafford Dev., L.L.C.* (2010), 2011 WI App 8, 331 Wis.2d 208, 794 N.W.2d 916, ¶ 14 ("The rationale for the economic waste rule is that if the cost to repair or restore a defect is so high as to exceed the diminished value of the property based on the defect, a party is unlikely to use the extra money to fix the defect. Instead, the party will keep the money and receive a windfall").

{¶ 34} Similar concerns about unjust enrichment underlie the rule establishing the measure of damages for temporary injury to real property. In *Ohio Collieries v. Cocke* (1923), 107 Ohio St. 238, 248–249, 140 N.E. 356, the Supreme Court of Ohio held that if wrongful injury to real property can be repaired, then:

> [T]he measure of damages is the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure.

Like the economic-waste rule, this rule seeks to preclude the injured party from receiving a monetary windfall. In the case of temporary injury to real property, the injured party achieves this windfall by choosing to sell the property rather than restore it, resulting in a profit to the extent that the restoration costs exceed the diminution in market value. *Duquesne Light Co. v. Woodland Hills School Dist.* (Pa.Commw.1997), 700 A.2d 1038, 1053; *Safeco Ins. Co. v. J & D Painting* (1993), 17 Cal.App.4th 1199, 1202–1203, 21 Cal.Rptr.2d 903; *Weld Cty. Bd. of Commrs. v. Slovek* (Colo.1986), 723 P.2d 1309, 1317.

{¶ 35} Recently, in *Martin v. Design Constr. Servs., Inc.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10, the Supreme Court of Ohio limited the rule enunciated in *Ohio Collieries*. The court recognized the relevance of evidence regarding the diminution in market value of injured property in setting a damage award. However, the court abjured *Ohio Collieries'* automatic limitation of damages to the loss of market value when the cost of restoration exceeded that loss. In the place of the *Ohio Collieries* rule, the court imposed a reasonableness test. While diminution in market value remains a consideration, "the essential inquiry is whether the damages sought are reasonable." Id. at ¶ 25.

{¶ 36} The economic-waste rule and the rule expressed in *Ohio Collieries* developed in different contexts. The economic-waste rule restricts the damages recoverable for breach of contract. The rule governing imposition of damages for the temporary injury to real property originated from, and is generally applied to, tort cases. See *Booth v. Duffy Homes, Inc.*, 10th Dist. No. 07AP–680, 2008-Ohio-5261, 2008 WL 4517808, ¶ 18–19, modified, 185 Ohio App.3d 260, 2009-Ohio-6767, 923 N.E.2d 1175 (recognizing that the majority of cases applying the *Ohio Collieries* measure of damages involved tort claims, but applying that measure of damages in a contract action because the same principles of compensation govern both tort and contract actions). Nevertheless, we conclude that the reasonableness test announced in *Martin* precludes a strict application of the economic-waste rule.

{¶ 37} "The fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained." *Fantozzi v. Sandusky Cement Prods. Co.* (1992), 64 Ohio St.3d 601, 612, 597 N.E.2d 474. Thus, in both contract and tort actions, the appropriate measure of damages is that which will make the injured party whole. *Sinclair Community College Dist. Bd. of Trustees v. Farra*, 186 Ohio App.3d 662, 2010-Ohio-1130, 929 N.E.2d 1105, ¶ 23; *Safe Auto Ins. Co. v. Hasford*, 10th Dist. No. 08AP–249, 2008-Ohio-4897, 2008 WL 4368481, ¶ 28. Consequently, both the economic-waste rule and the rule governing temporary injury to real property share the same objective. Moreover, as we explained above, both rules emerged from a desire to prevent the injured party from receiving a windfall. Given the rules' identical purpose and origin, we conclude that the economic-waste rule, like the *Ohio Collieries* rule, must cede in favor of the reasonableness test.

{¶ 38} Therefore, in a case involving a breach of a construction contract where the breaching party seeks to limit damages to the diminution in value, a fact-finder must determine whether under the facts of that case, it is more reasonable to award damages based on the cost of the remedy or based on the diminution in value. Although a fact-finder may consider whether the cost of the remedy grossly exceeds the difference in the value of the structure with and without the defect, that consideration will not necessarily control the amount of the damage award. Since the goal of any damage award is to make a party whole, a fact-finder must determine which measure of damage best accomplishes that goal without exceeding the bounds of reasonableness.

{¶ 39} Here, the trial court awarded appellees the cost to replace the siding because it determined that damages based on loss of market value could not fully compensate appellees. Because the purpose of the contract was the construction of a custom-built home with the aesthetics appellees desired, Fannin Builders' failure to achieve those aesthetics warranted an award of damages that would

allow appellees to correct the defect. We find the trial court's decision to award appellees the cost of replacement, rather than the loss of market value, reasonable in this case.

{¶ 40} As appellees testified, they contracted for the construction of a custom-built home. Appellees decided to build such a home because they wanted a particular house design and the ability to choose any material and finish they liked. Appellees explained to Fannin Builders that they wanted their house to have a natural, rustic look and that to achieve this look, they wanted T1–11 exterior siding stained with a semitransparent stain. Although the contract did not designate any particular stain opacity, Fannin conceded in his trial testimony that under the contract, Fannin Builders was obligated to apply stain with the opacity that appellees chose. Indisputably, appellees chose a semitransparent stain.

{¶ 41} Because appellees placed such importance on the natural appearance of their home, they repeatedly rebuffed Fannin Builders' suggestion that they accept a solid stain. Appellees hired Fannin Builders to construct their "dream home," in which they planned to live many years. Consequently, appellees vigorously opposed Fannin Builders' attempts to get them to compromise on their desire to have T1–11 siding with a semitransparent stain.

{¶ 42} According to 84 Lumber's expert witness, the market value of appellees' home is $8,500 less than it would be if it was stained a uniform color. The expert witness arrived at this valuation because the cost to apply two coats of solid stain to the siding is $8,500. Under the economic-waste rule, appellees' damages might have amounted to only $8,500, as opposed to the $66,906.24 necessary to replace the siding.[2] We, however, concur with the trial court that $8,500 could not fully compensate appellees. Given that appellees contracted for a custom home and that appellees place a high value on the rustic look, the cost to achieve the rustic look is the only reasonable measure of damages. Thus, the trial court did not err in awarding appellees damages based on the cost to replace the siding.

---

**2.** {¶ a} We question the likelihood of this outcome. Courts outside of Ohio exempt cases from the economic-waste rule and award damages based on the cost of remedy when aesthetic values make correction of the defect particularly important to a homeowner. See, e.g., *Advanced, Inc. v. Wilks* (Alaska 1985), 711 P.2d 524, 527; *Carter v. Quick* (1978), 263 Ark. 202, 209–210, 563 S.W.2d 461; *Fox v. Webb* (1958), 268 Ala. 111, 119, 105 So.2d 75; *Lyon v. Belosky Constr., Inc.* (N.Y.App.Div.1998), 247 A.D.2d 730, 732, 669 N.Y.S.2d 400; *Kangas v. Trust* (1982), 110 Ill.App.3d 876, 883, 65 Ill.Dec. 757, 441 N.E.2d 1271. As one court observed:

{¶ b} If a proud householder, who plans to live out his days in the home of his dreams, orders a new roof of red barrel tile and the roofer instead installs a purple one, money damages for the reduced value of his house may not be enough to offset the strident offense to aesthetic sensibilities, continuing over the life of the roof.

{¶ c} *Gory Assoc. Industries, Inc. v. Jupiter Roofing & Sheet Metal, Inc.* (Fla.App.1978), 358 So.2d 93, 95.

{¶ 43} Fannin Builders also attacks the damages award on the basis that it should not include the cost to remove and replace the lap siding, porch ceiling, and porch columns. Fannin Builders contends that it should not have to pay for the removal and replacement of these items because they did not evince an inconsistent stain color like the siding.

{¶ 44} Judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. In reviewing a trial court's factual findings, an appellate court must presume that the findings are correct because the trial court is best able to observe the witnesses and use those observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 10 OBR 408, 461 N.E.2d 1273. If the evidence is susceptible of more than one interpretation, an appellate court must construe it consistently with the trial court's judgment. *Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 584, 653 N.E.2d 639.

{¶ 45} Damages for the repair of deficient of work may include the cost of additional activities necessitated by the deficient work. *Jarupan* at ¶ 19. To support the damages award, appellees introduced an estimate prepared by NJW Construction, Inc. ("NJW") and dated August 31, 2009. According to Joel Walter, an NJW employee, NJW estimated that the cost of "removing and replacing the siding on Steve and Nancy's home" was $61,916.24 (excluding the cost of replacing landscaping). The estimate includes the cost of removing and replacing the bevel siding (in addition to the T1–11 siding), the soffit, and the fascia. Although the bevel siding, soffit, and fascia are not T1–11 siding, Walters incorporated their removal and replacement as part of the larger task of removing and replacing all the siding and trim on appellees' home. An earlier NJW estimate and Walters's testimony indicates that replacement of the bevel siding is necessary to achieve a uniform stain color, and replacement of the existing yellow pine soffit and fascia with fir is necessary because fir accepts stain better than yellow pine. Consequently, competent, credible evidence establishes that the cost of the removal and replacement of the bevel siding, soffit, and fascia are recoverable damages.

{¶ 46} Because the trial court's award of damages is both reasonable and supported by competent, credible evidence, we conclude that the trial court did not err in setting appellees' damages at $62,997.26. Accordingly, we overrule Fannin Builders' third assignment of error.

{¶ 47} By its fourth assignment of error, Fannin Builders argues that the trial court erred in ruling in 84 Lumber's favor on Fannin Builders' claims of

breach of contract and indemnity against it. Under the terms of the August 2, 2005 letter agreement, 84 Lumber agreed to procure and install replacement siding and, in return, Fannin Builders agreed to accept all liability related to stain color. Fannin Builders contends that this agreement does not relieve 84 Lumber of liability because 84 Lumber failed to fulfill all its obligations under the agreement. Although 84 Lumber procured and delivered the replacement siding, it failed to install that siding.

{¶ 48} While Fannin Builders correctly asserts that 84 Lumber never installed the replacement siding, it ignores the fact that it had ordered 84 Lumber to remove the replacement siding from appellees' property. Thus, Fannin Builders precluded 84 Lumber from completely performing under the August 2, 2005 letter agreement. A contracting party who prevents the adverse party from performing under the contract cannot take advantage of the adverse party's nonperformance. *Gary Crim, Inc. v. Rios* (1996), 114 Ohio App.3d 433, 436, 683 N.E.2d 378. Consequently, Fannin Builders cannot now claim that the letter agreement is unenforceable or that it is entitled to indemnification from 84 Lumber. Because Fannin Builders assumed all liability for the defective siding in the letter agreement, it is responsible for appellees' damages. Accordingly, we overrule Fannin Builders' fourth assignment of error.

{¶ 49} For the foregoing reasons, we overrule all of Fannin Builders' assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

BRYANT, P.J., and FRENCH, J., concur.